UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CHUKWUEMEKA NDULUE,                        NO. CIV. 2:08-1696 WBS KJM

        Plaintiff,

    v.                                    MEMORANDUM AND ORDER RE:
                                          MOTIONS FOR SUMMARY JUDGMENT
FREMONT-RIDEOUT HEALTH GROUP;
LEONARD MARKS; PUSHPA RAMAN;
CHERRY ANN WY; ARUM KUMAR;
HARRY WANDER; and MAX LINS,

        Defendants.
_____/


----oo0oo----


      Plaintiff Chukwuemeka Ndulue brought this action
alleging that Fremont-Rideout Health Group ("FRHG") and doctors
Leonard Marks, Pushpa Raman, Cherry Ann Wy, Arum Kumar, Harry
Wander, and Max Lins (the "doctor defendants") unlawfully
interfered with his ability to enter into contracts because of
his race.  Defendants now each move for summary judgment pursuant
to Federal Rule of Civil Procedure 56.

1

I.    Standard

         Summary judgment is proper "if the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).  A material fact is one that could affect
the outcome of the suit, and a genuine issue is one that could
permit a reasonable jury to enter a verdict in the non-moving
party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  The party moving for summary judgment bears the
initial burden of establishing the absence of a genuine issue of
material fact and can satisfy this burden by presenting evidence
that negates an essential element of the non-moving party's case.
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
Alternatively, the moving party can demonstrate that the
non-moving party cannot produce evidence to support an essential
element upon which it will bear the burden of proof at trial.
Id.

         Once the moving party meets its initial burden, the
non-moving party "may not rely merely on allegations or denials
in its own pleading," but must go beyond the pleadings and, "by
affidavits or as otherwise provided in [Rule 56,] set out
specific facts showing a genuine issue for trial."  Fed. R. Civ.
P. 56(e); Celotex Corp., 477 U.S. at 324; Valandingham v.
Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989).  In its inquiry,
the court must view any inferences drawn from the underlying
facts in the light most favorable to the nonmoving party, but may
not engage in credibility determinations or weigh the evidence.

2

1  Anderson, 477 U.S. at 255; Matsushita Elec. Indus. Co., Ltd. v.

2  Zenith Radio Corp., 475 U.S. 574, 587 (1986).

3  II.  Evidentiary Objections

4          "A trial court can only consider admissible evidence in

5  ruling on a motion for summary judgment."  Orr v. Bank of Am., NT

6  & SA, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P.

7  56(e); Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181

8  (9th Cir. 1988)).  After receiving defendants' objections to

9  plaintiff's evidence supplied in opposition to the motions for

10  summary judgment, the court granted plaintiff an opportunity to

11  resubmit his briefs and evidence to take defendants' evidentiary

12  objections into account.  (Docket No. 211.)  In response to

13  plaintiff's amended evidence, defendants filed the twenty-nine

14  evidentiary objections now before the court.  (Docket No. 220.)

15          "[T]o survive summary judgment, a party does not

16  necessarily have to produce evidence in a form that would be

17  admissible at trial, as long as the party satisfies the

18  requirements of Federal Rules of Civil Procedure 56."  Fraser v.

19  Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (citing Block v.

20  City of Los Angeles, 253 F.3d 410, 418-19 (9th Cir. 2001)).

21  While much of plaintiff's evidence is presented in a form that is

22  currently inadmissible, such evidence may be evaluated on a

23  motion for summary judgment so long as defendants' objections

24  could be cured at trial.  See Burch v. Regents of the Univ. of

25  Cal., 433 F. Supp. 2d 1110, 1119-20 (E.D. Cal. 2006).

26          Many of defendants' objections are well-taken.  Despite

27  being afforded an opportunity by the court to amend his exhibits

28  and declarations to avoid defendants' objections, plaintiff by

1  and made only minimal changes to his evidence and failed to
2  account for most, if not all, of defendants' objections.  It
3  would be obvious to any lawyer that many statements in the
4  Amended Ndulue Declaration are objectionable.  For example, the
5  Ndulue Declaration contains several conclusory and argumentative
6  statements that completely lack foundation, such as plaintiff's
7  statement that one defendant's conduct "was just the beginning of
8  [defendant's] campaign to drive [plaintiff] out of town" (Am.
9  Ndulue Decl. at 2:24-25), or that plaintiff was "maliciously
10  given false instructions" by a defendant.  (<u>Id.</u> at 4:10.)
11  Several statements in the Ndulue Declaration are also blatantly
12  hearsay, such as plaintiff's contention that "Dr. Joseph Coulter
13  told [plaintiff] that . . . Dr. Wander . . . requested
14  [plaintiff] not be given privileges at the hospital." (<u>Id.</u> at
15  9:4-10.) <u>See</u> Fed. R. Evid. 802, 805.

16        Additionally, plaintiff supplied a number of exhibits
17  that are clearly not properly authenticated and are therefore
18  inadmissible.  Exhibits EE, GG and HH to the Amended Nguyen
19  Declaration all are statements from women who claim that they
20  were steered away from choosing plaintiff as their child's
21  physician.  These statements are not properly authenticated
22  because they are handwritten, unsworn, and are not accompanied by
23  an affidavit from any of the women in question attesting to their
24  authenticity.  <u>See</u> <u>Orr v. Bank of Am. NT & SA</u>, 285 F.3d 764, 777
25  (9th Cir. 2002); Fed. R. Evid. 901.

26        In the interest of brevity, as defendants are aware of
27  the substance of their objections and the grounds asserted in
28  support of each objection, the court will not review the

4

substance or grounds of all the objections here.  For the
purposes of this motion, defendants' objections 2, 4, 7, 15-16,
and 25-26 and are overruled.   Objections 1, 3, 5-6, 8-14, 17-24,
and 27-29 are sustained.

III. <u>Relevant Facts</u>

        Defendant FRHG is a non-profit health care organization
that operates two hospitals, Fremont Medical Center in Yuba City,
California and Rideout Memorial Hospital in Marysville,
California.  (White Decl. (Docket No. 168) ¶ 3.)  FRHG's medical
staff is comprised of physicians who have privileges to admit and
care for patients at both hospitals.  (<u>Id.</u>)  The medical staff is
a separate entity from FRHG and none of the doctors on the staff
are employees of FRHG.  (<u>Id.</u> ¶ 11.)  Each physician with staff
privileges must reapply for privileges every two years.  (<u>Id.</u> ¶
9.)

        In 2001, plaintiff applied for privileges to admit and
care for patients as a pediatrician at FRHG.  (FRHG Zimmerman
Decl. Ex. B ("Ndulue Depo. Vol. II") at 212:14-18; Am. Ndulue
Decl. (Docket No. 215) ¶ 3; Am. Nguyen Decl. Ex. II.)  Plaintiff
is a black man who was born in Nigeria.  (Am. Ndulue Decl. ¶ 1.)
During the process of applying for privileges at FRHG, plaintiff
made a call to defendant Marks, who was the Chairman of
Pediatrics at FRHG at the time.  (<u>Id.</u> ¶ 4.)  Marks purportedly
told plaintiff that his services were not needed in Yuba
City/Marysville area because current pediatricians were having
trouble filling their practices and plaintiff would cause more
problems by locating to the area.  (<u>Id.</u>)  When plaintiff told
Marks that he still intended to move to the area, Marks allegedly

1  stated that he would ensure that nobody shared calls with

2  plaintiff.  (Id.)

3  Plaintiff was granted privileges by FRHG later in 2001.

4  (Id. ¶ 3.)  Once a doctor is given privileges, he or she must

5  undergo "proctoring" by other physicians in his or her field of

6  specialty to demonstrate that he or she is competent to perform

7  the functions and procedures he or she has sought privileges to

8  perform.  (White Decl. ¶ 4.)  During the proctoring period,

9  several different doctors in a new member's specialty field are

10  assigned as proctors.  (Id.)  The proctors may question the

11  doctor's diagnosis, treatment plan, or any other issue involving

12  care, and the doctor must explain his or her decisions.  (Id. ¶

13  5.)  Proctoring is stopped when the doctor has demonstrated his

14  or her competency to the satisfaction of the proctors.  (Id. ¶

15  6.)

16  With one exception,[1] plaintiff was the only black

17  pediatrician who worked in Fremont Medical Center and Rideout

18  Memorial Hospital.  (Am. Nguyen Decl. Ex. S ("Wy Depo.") at

19  21:21-22:2.)  On plaintiff's first day at FRGH in 2002, Marks

20  gave plaintiff a tour of the hospital.  (Am. Ndulue Decl. ¶ 5.)

21  During the tour, Marks told plaintiff that his "ass was on the

22  line" during proctoring.  (Id.; Am. Nguyen Decl. Ex. A ("Marks

23  Depo.") at 129:7-14, Ex. C.)  Marks was also plaintiff's proctor

24  when plaintiff admitted his first patient to the hospital; a

25  child with neonatal jaundice who had lost thirteen percent of her

26

27  [1]  For a period of time one other black pediatrician, Dr.
Eribo, worked at Fremont Hospital.  Dr Eribo was an employee of
28  plaintiff.  (Am. Nguyen Decl. Ex. S at 21:21-22:2.)

6

body weight since birth.  (Am. Ndulue Decl. ¶ 6.; Am. Nguyen
Decl. Ex. C. at 2.)  Marks disagreed with plaintiff's choice of
treatment for the patient, contending that plaintiff should have
been more concerned about the child's potential dehydration and
given her more fluids.  (Ndulue Depo. Vol. II at 236:12-15; Am.
Ndulue Decl. ¶ 6; Marks's Zimmerman Decl. Ex. D. ("Marks Depo.")
157:15-158:1.)  Plaintiff argued that his treatment plan complied
with the American Academy of Pediatrics' standards and was
appropriate.  (Am. Ndulue Decl. ¶ 6.)  Marks subsequently told
plaintiff that if Marks were plaintiff's chief resident Marks
would have thrown him out of the program for poor management.
(Id.; Am. Nguyen Decl. Ex. C at 2.)

        After this disagreement, Marks spoke with two other
doctors about the case to see what method of treatment they
believed was appropriate: Dr. Andrew Wurtz, the Chief of
Neonatology at Sutter Memorial Hospital, and Dr. Michael Sherman,
the Chief of Neonatology at the University of California, Davis
Medical Center.  (Marks Depo. at 158:8-17.)  Plaintiff also spoke
with Sherman about the case.  (Ndulue Depo. Vol. II at 245:10-
247:15.)  During this conversation, plaintiff claims that Sherman
told him that his treatment plan was adequate and that Marks used
the "n-word" to describe plaintiff while discussing the case.
(Am. Ndulue Decl. ¶ 6.)

        In addition to initial proctoring, a physician's care
is subject to ongoing peer review.  (White Decl. ¶ 7.)  The chief
and vice-chief of pediatrics are responsible for peer review and
have the ability to make a determination as to whether a doctor's
decisions meet appropriate standards of care as part of the

1 Department of Pediatrics Steering Committee ("Steering

2 Committee"). (Id. ¶¶ 7-8.)  The Medical Executive Committee

3 ("MEC") reviews the recommendations from the Steering Committee

4 concerning doctors at Fremont Medical Center and Rideout Memorial

5 Hosptial and may issue sanctions based on the recommendations.

6 During plaintiff's time with FRHG, Marks, Raman, Wy, and Kumar

7 each served as the chief of pediatrics. (Id. ¶ 10.)

8          In the fall of 2002, plaintiff's treatment of a patient

9 with meningococcemia was referred to the MEC for review by Marks.

10 (Am. Ndulue Decl. ¶ 9; Am. Nguyen Decl. Ex. G.)  Plaintiff was

11 the third doctor to see the patient and initially diagnosed him

12 with a different condition.  (Am. Ndulue Decl. ¶ 10; Am. Nguyen

13 Decl. Ex. G.)  Plaintiff subsequently received a letter from

14 Tracy McCollum, the Quality Management Coordinator of FRHG,

15 questioning plaintiff's management of the case, including his

16 decisions to delay in performing a spinal tap on the patient and

17 not administer a specific antibiotic.  (Am. Ndulue Decl. ¶ 10.)

18 Plaintiff sent a response to McCollum defending his treatment on

19 October 21, 2002.  (Am. Nguyen Decl. Ex. G.)  On November 5,

20 2002, plaintiff received a letter from Marks indicating that

21 plaintiff's treatment in the case would be up for peer review

22 with the Steering Committee.  (Id. Ex. H.)  The Steering

23 Committee ultimately found plaintiff's treatment to be deficient

24 and recommended a prospective focused review of 100 of

25 plaintiff's cases where a patient had a fever of over 101 degrees

26 to assess his quality of care.  (Id. Ex. I; Am. Ndulue Decl. ¶

27 10.)  The MEC agreed with this recommendation.  (Am. Nguyen Decl.

28 Ex. I.)

After learning of the decision, plaintiff requested a hearing before the MEC to explain his treatment decisions. (Id. Ex. H; Am. Ndulue Decl. ¶ 10.)  Plaintiff met with the MEC on December 19, 2002. (Am. Nguyen Decl. Ex. H.)  As a result of the meeting, the MEC decided to change the planned focused review of 100 of plaintiff's cases to a review all of plaintiff's cases, excluding normal newborns, until the MEC's February meeting. (Id.)  Raman, Wy, Kumar, Wander, Lins, and Marks filed numerous other peer-review-related complaints against plaintiff from 2002 to 2008, charging him with inadequate documentation, unprofessional behavior, and missteps in treatment. (Id. Exs. X, MM, NN, OO, PP, QQ.)  Plaintiff was subsequently only granted hospital privileges with FRHG for an additional year, instead of the two-year period normally granted to doctors in good standing. (Am. Ndulue Decl. ¶ 21.)

In addition to his own practice, plaintiff worked as part of FRHG's On-Call Pediatrician ("OCP") service. (Id. ¶ 14.) The OCP is designated as a baby's pediatrician if a mother in labor has not chosen a pediatrician for her child before birth. (White Decl. ¶ 12.)  In 2002, defendant Kumar allegedly asked plaintiff if he was "the doctor that is going to take the OCP from us." (Am. Ndulue Decl. ¶ 15.)  In early 2003, plaintiff attempted to recruit an associate from outside of FRHG, Dr. Glenn Law, to assist him with the OCP service. (Id. ¶ 11.)  Defendant Raman notified plaintiff that FRHG denied Law privileges because he did not meet FRHG's requirement that any doctor out of training for forty-eight months must have assumed primary care for at least six neonatal intensive care patients over the

twenty-four months before his or her application.  (Am. Nguyen
Decl. Ex. L.)   In July 2003, plaintiff hired Dr. Valeriy Chorny
to assist him with the OCP service.  (Am. Ndulue Decl. ¶ 14.)
Chorny was subjected to numerous peer reviews by other FRHG
doctors during his time working with plaintiff, including an ad
hoc committee created by defendants Raman and Wy to discuss one
incident in which Chorny failed to indicate the time on the chart
of one of his patients.  (Id.)  Plaintiff ceased managing the OCP
service in 2005.

Plaintiff began hearing comments from his patients'
parents that their requests for plaintiff to be assigned as their
newborn children's physician were ignored or discouraged by FRHG
medical staff. (Am. Ndulue Decl. ¶¶ 24-30.)   Under FRHG policy,
when a mother appears in labor hospital nurses ask the expectant
mother if she has a pediatrician for her baby.  (White Decl. ¶
12.)  If the mother has not chosen a pediatrician, the labor and
delivery nurses designate the OCP as the baby's pediatrician.
(Id.)  If the mother indicates a preference for a specific
pediatrician, the requested physician is assigned to the baby and
is notified when the child is born.  (Id.; Am. Nguyen Decl. Ex. Y
("Chambers Depo.") at 13:2-15.)   Between 2005 and 2009, at least
eleven different women stated that they requested plaintiff as
their pediatrician but were either assigned another doctor
without explanation or actively discouraged by several of the
doctor defendants from using plaintiff as their pediatrician.
(Am. Nguyen Decl. Exs. AA-DD, FF.)

On July 23, 2008, plaintiff filed this action against
defendants, alleging racial discrimination preventing his right

10

1  to contract in violation of 42 U.S.C. § 1981; conspiracy to
2  deprive plaintiff of his constitutional rights in violation of 42
3  U.S.C. § 1985; tortious interference with prospective business
4  and economic relationships; violations of California's Unfair
5  Competition Law, Cal. Bus. & Prof. Code §§ 17200-17210;
6  intentional infliction of emotional distress; negligent
7  infliction of emotional distress; and a request for injunctive
8  relief.  (Docket No. 1.)  Defendants now move for summary
9  judgment, or in the alternative partial summary judgment,
10  pursuant to Federal Rule of Civil Procedure 56.
11  IV.  <u>Summary Judgment</u>
12       A.   <u>Section 1981 Claim</u>
13            42 U.S.C. § 1981 provides that "[a]ll persons within
14  the jurisdiction of the United States shall have the same right
15  in every State and Territory to make and enforce contracts . . .
16  and to the full and equal benefit of all laws and proceedings for
17  the security of persons and property as is enjoyed by white
18  citizens . . . ."  42 U.S.C. § 1981(a).  Section 1981 is the
19  present codification of section 16 of the one-hundred-and-forty-
20  year-old Civil Rights Act of 1870, 16 Stat. 144, which was
21  enacted pursuant to the federal legislative power to enforce the
22  Thirteen Amendment's prohibition of slavery.  <u>See</u> <u>Runyon v.</u>
23  <u>McCrary</u>, 427 U.S. 160, 180 (1976); <u>Johnson v. Railway Exp.</u>
24  <u>Agency, Inc.</u>, 421 U.S. 454, 459 (1975).  The Supreme Court has
25  read § 1981 to prohibit racial discrimination in the making and
26  enforcement of private and governmental contracts against
27  nonwhites and whites alike.  <u>See</u> <u>McDonald v. Santa Fe Trail</u>
28  <u>Transp. Corp.</u>, 427 U.S. 273, 295 (1976).

11

1    While the protection against racial discrimination in §
2    1981 often overlaps with the protections of Title VII and 42
3    U.S.C. § 1983, the requirements to bring a § 1981 claim are far
4    more lax and the extent of its protections are far more sweeping.
5    Unlike Title VII, a § 1981 claim does not require a plaintiff to
6    exhaust administrative remedies, allows employers with less than
7    fifteen employees to be sued, entitles plaintiffs to punitive
8    damages, and permits suits against independent contractors and
9    individual employees.  <u>See</u> <u>Johnson</u>, 421 U.S. at 460-61.  Unlike a
10   suit under § 1983, no state action is required in a § 1981 action
11   and the defendants are not entitled to qualified immunity.  Even
12   the state and federal immunities that apply to doctors'
13   participation in medical reviews do not apply in the context of a
14   § 1981 claim.  <u>See</u> 42 U.S.C. § 11111(a)(1)(D).  It is doubtful
15   that anyone could have imagined the reach and scope that § 1981
16   would have at the time of its enactment, but nevertheless this
17   court must interpret § 1981 in light of the subsequent rulings of
18   the higher courts.

19   "Analysis of an employment discrimination claim under §
20   1981 follows the same legal principles as those applicable in a
21   Title VII disparate treatment case."  <u>Fonseca v. Sysco Food Serv.</u>
22   <u>of Ariz., Inc.</u>, 374 F.3d 840, 850 (9th Cir. 2004).  Typically,
23   this includes the use of the burden-shifting analysis established
24   in <u>McDonnell Douglas Corporation v. Green</u>, 411 U.S. 792 (1973).
25   <u>Metoyer v. Chassman</u>, 504 F.3d 919, 930-31 (9th Cir. 2007); <u>see</u>
26   <u>also</u> <u>Fonseca</u>, 374 F.3d at 850.

27   Under the <u>McDonnell Douglas</u> framework, "the burden of
28   production first falls on the plaintiff to make out a prima facie

case of discrimination." <u>Coghlan v. Am. Seafoods Co. LLC</u>, 413

F.3d 1090, 1094 (9th Cir. 2005).  To establish a prima facie case

of discrimination under § 1981 a plaintiff must show that: (i) he

was a member of a protected class; (ii) he attempted to contract

for certain services; (iii) he was denied the right to

contractfor those services; and (iv) a similarly-situated person

outside of his protected class was offered the contractual

services which were denied to the plaintiff.  <u>Ennix v. Stanten</u>,

556 F. Supp. 2d 1073, 1085 (N.D. Cal. 2008) (citing <u>Lindsey v.</u>

<u>SLT Los Angeles, LLC</u>, 447 F.3d 1138, 1144 (9th Cir. 2006)).[2]

"[I]f the plaintiff satisfies the initial burden of establishing

a prima facie case of racial discrimination, the burden shifts to

the defendant to prove it had a legitimate non-discriminatory

reason for the adverse action.  If the defendant meets that

burden, the plaintiff must prove that such a reason was merely a

pretext for intentional discrimination."  <u>Ennix</u>, 556 F. Supp. 2d

at 1085.

       "[W]hen responding to a summary judgment motion . . .

[the plaintiff] may proceed by using the <u>McDonnell Douglas</u>

framework, or alternatively, may simply produce direct or

circumstantial evidence demonstrating that a discriminatory

reason more likely than not motivated [the defendant]."  <u>McGinest</u>

---

[2]      Defendants cite <u>Kirt v. Fashion Bug # 3252, Inc.</u>, 495
F. Supp. 2d 957 (N.D. Iowa 2007), for the proposition that the
elements of a prima facie case of discrimination under § 1981
require proof of "discriminatory intent on the party of the
defendant."  <u>Kirt</u> both is not binding on this court and fails to
discuss either the application of the <u>McDonnell Douglas</u> framework
to a § 1981 claim or what evidence would provide be sufficient to
show discriminatory intent on summary judgment.  Accordingly, the
court will follow the Ninth Circuit's formulation of the prima
facie case in a § 1981 claim enumerated in <u>Lindsey</u> and <u>Ennix</u>.

1  v. GTE Serv. Corp., 360 F.3d 1103, 1122 (9th Cir. 2004).  "When

2  the plaintiff offers direct evidence of discriminatory motive, a

3  triable issue as to the actual motivation of [the defendant] is

4  created even if the evidence is not substantial."  Godwin v. Hunt

5  Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998); see also

6  Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994).

7       1.   Marks, Wy, and Kumar

8       Plaintiff has made a prima facie case of

9  discrimination against defendants Marks, Wy, and Kumar by

10  providing both direct and indirect evidence that, taken in a

11  light most favorable to plaintiff, could allow a jury to find

12  that plaintiff was discriminated against.  First, because

13  plaintiff is of black Nigerian descent, he is a member of a

14  protected class under § 1981.  See Saint Francis College v.

15  Al-Khazraji, 481 U.S. 604, 609 (1987).  Second, plaintiff

16  attempted to contract for medical services with patients at

17  Fremont Hospital and Rideout Medical Center and to contract for

18  two-years of clinical privileges with FRHG.  Third, plaintiff has

19  provided evidence that he was denied the ability to contract with

20  potential patients when patients were reassigned to other doctors

21  by Wy and Kumar in contravention of hospital policy and when FRHG

22  only extended him one-year of clinical privileges instead of the

23  typical two-year agreement because of complaints against him by

24  Marks.  See Ennix, 556 F. Supp. 2d at 1085.

25       Finally, other doctors with FRHG privileges who were

26  not part of defendants' protected class were given patients who

27  requested plaintiff to be their child's pediatrician against

28  hospital protocol.  Plaintiff has also presented evidence that he

14

was subject to peer review by defendants more frequently than other doctors at the hospital for offenses that other doctors who were not in his protected class regularly committed.  As a result of these reviews, plaintiff received a contract for one-year worth of privileges at FRHG instead of the typical two-year contract.  Plaintiff has therefore established a prima facie case of discrimination.  See Ennix, 556 F. Supp. 2d at 1085.

In response to plaintiff's prima facie case, Marks, Kumar, and Wy solely argue that plaintiff has not provided sufficient evidence such that a jury could find defendants had any discriminatory animus toward plaintiff.  However, plaintiff has provided numerous pieces of direct and circumstantial evidence which a jury may find prove defendants' treatment of plaintiff was motivated by discriminatory reasons.  Plaintiff has provided direct evidence of discrimination by Marks through testimony that Marks may have referred to plaintiff using the "n-word" and aggressively lodging a disproportionate number of reviews of plaintiff's cases.  See Godwin, 150 F.3d at 1221 (citing cases of racial slurs constituting direct evidence of discrimination); Mustafa v. Clark County Sch. Dist., 157 F.3d 1169, 1180 (9th Cir. 1998) ("[D]iscriminatory remarks are relevant evidence that . . . can create a strong inference of intentional discrimination.").

Plaintiff has also presented evidence that Kumar and Wy took patients that should have been assigned to plaintiff under hospital policy and discouraged patients from using plaintiff as their child's pediatrician.  (See Am. Nguyen Decl. Exs. AA, CC.) These actions, which violated hospital policy and specifically

targeted plaintiff and not other non-black similarly-situated doctors, impacted his right to contract and accordingly support an inference that discriminatory reasons motivated defendants' actions.  See Wallis, 26 F.3d at  889; see also Chuang v. Univ. of Cal. Davis, Bd. of Trustees, 225 F.3d 1115, 1124 (9th Cir. 2000); Ennix, 556 F. Supp. 2d at 1085.  While Marks, Kumar, and Wy uniformly dispute that their actions were motivated by plaintiff's race, such questions of fact are disputed issues for a jury, not the court on summary judgment.

Marks, Kumar, and Wy have failed to produce evidence of a legitimate, nondiscriminatory reason for their conduct, and accordingly have failed the to meet the burden of production necessary to defeat plaintiff's § 1981 discrimination claim on summary judgment under the McDonnell Douglas framework.  See Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981).  Accordingly, the court must deny Marks, Kumar, and Wy's motions for summary judgment on plaintiff's § 1981 claim.

2.  Raman

Plaintiff has failed to make a prima facie case of discrimination against defendant Raman.  Plaintiff contends that Raman denied him the right to contract at FRHG when she denied privileges to plaintiff's associate, Dr. Law, to frustrate plaintiff's practice as the OCP physician, used the peer review process to "nitpick" at him, and failed to prevent diversion of plaintiff's patients.  First, plaintiff has failed to provide any evidence that the denial of Dr. Law's neonatal intensive care privileges deprived plaintiff of the right to contract or hindered his OCP practice.  Raman's denial of privileges to Dr.

16

Law was in accordance with the hospital's policy on the requisite level of experience required to work in neonatal intensive care. (See Am. Nguyen Decl. Ex. L.)  While plaintiff argues that other FRHG doctors were not subject to these experience requirements, he has provided no evidence to support this contention aside from a chart that simply lists the names of doctors with neonatal intensive care privileges.  (Id. Ex. M.)  Plaintiff has also not explained how denial of Dr. Law's neonatal privileges negatively affected his ability to practice.  Accordingly, plaintiff has not shown that Raman's rejection of Dr. Law interfered with his right to contract or supports an inference of discrimination.

Second, plaintiff has not provided sufficient evidence that Raman subjected him to excessive levels of peer review that denied him the ability to contract.  The only evidence submitted in support of this contention is several letters from Raman to plaintiff that summarize several hospital policies with regard to admissions and bed space for infants with signs of respiratory syncytial virus, remind plaintiff to keep daily notes in patients' charts, discuss plaintiff's treatment of a jaundiced child, and inform plaintiff of a complaint from hospital staff. (Id. Exs. O, X.)  There is no evidence that Raman treated plaintiff differently than similarly-situated individuals outside his protected class or lacked a reasonable basis for her complaints.  These few letters accordingly do not establish a pattern of "harassment" by Raman such that a reasonable jury could find denied plaintiff the ability to contract with either FRHG or patients, or that Raman's reviews constituted "circumstances giving rise to an inference of discrimination."

17

Aragon v. Republic Silver State Disposal Inc., 292 F.3d 654, 660 (9th Cir. 2002).

Finally, plaintiff has not supplied any evidence that Raman had any involvement with the diversion of patients from plaintiff. Although Raman was the Chief of Pediatrics at the time, plaintiff has not supplied evidence indicating that Raman was aware of these diversions or actively participated in them. Plaintiff has not produced evidence that he was denied the ability to make and enforce contracts by Raman and accordingly has failed to establish a prima facie case of discrimination against her. See Ennix, 556 F. Supp. 2d at 1085.

3. Lins

Insufficient evidence also exists to establish a prima facie case of discrimination against Lins.[3] Plaintiff submits two pieces of evidence in support of his § 1981 claim against Lins: a series of letters referring to a complaint filed by Lins to the Steering Committee against plaintiff and a declaration from Carmela Pamatz, a former patient of the hospital. First, evidence of one complaint by Lins against plaintiff does not establish a pattern of harassment or serve as evidence that this complaint resulted in the denial of plaintiff's ability to contract for services at the hospital. In fact, the letters submitted to the court do not even indicate that plaintiff was disciplined as a result of Lins's complaint. (See Am. Nguyen

---

[3] Although plaintiff now contends that Lins is liable for the § 1981 claim, plaintiff claimed that he was "not contending [a § 1981 violation] for [Lins]" in his response to defendants' special interrogatories. (See Lins Zimmerman Decl. (Docket No. 147) Ex. F.)

18

Decl. Ex. PP.)  Plaintiff accordingly has failed to establish

Lins's complaint caused plaintiff's inability to contract.

Second, the Pamatz declaration does not establish that

Lins diverted patients from plaintiff.  In her declaration,

Pamatz states that Lins asked her if she had chosen a

pediatrician for her newborn child.  (Id. Ex. BB ¶ 6.)  Pamatz

responded that she "did not have a pediatrician" but would likely

bring her child to plaintiff in the future.  (Id.)  Although

Pamatz states Lins provided her a business card and offered that

"if she wanted to, she could come see him at his clinic," Lins

actions were not in contravention of hospital policy because

Pamatz stated that she had not yet chosen a physician for her

child.  (Id.)  Unlike Wy or Kumar, Lins did not interfere with

plaintiff's right to contract with Pamatz by assigning her child

to his care or disparaging plaintiff, but simply offered his

assistance to a patient in the future.  Accordingly, plaintiff

has not provided sufficient evidence to support a prima facie

case of discrimination against Lins because plaintiffs has not

shown that Lins denied his ability to make and enforce contracts

or engaged in conduct evincing discriminatory intent.  See

Ennix, 556 F. Supp. 2d at 1085.

4.  Wander

Plaintiff has provided admissible evidence of two

incidents which he argues establish a prima facie case of

discrimination against Wander.  In the first incident, Wander

complained to the MEC in April 2007 that plaintiff had issues

with documentation.  (See Am. Nguyen Decl. Ex. MM.)  This

complaint did not result in disciplinary action by the MEC after

19

1  it was noted that only twenty percent of doctors at FRHG followed

2  correct documentation procedure.  (Id.)  The second incident

3  occurred in July 2008, when Wander sent a letter to Kumar asking

4  him to review the chart of an infant treated by plaintiff because

5  plaintiff allegedly ordered treatment for the infant over the

6  phone without examining him, did not arrive at the hospital to

7  view the patient for over an hour and twenty minutes, and had not

8  recorded a physical exam or progress notes on the patient's

9  health.  (Id. Ex. NN.)

10       Neither of these events support a prima facie case of

11  discrimination against Wander.  Plaintiff has presented no

12  evidence that Wander's actions resulted in the denial of his

13  ability to enter into contracts.  In fact, plaintiff's evidence

14  explicitly indicates that the first of Wander's two complaints

15  did not result in any disciplinary action by the Medical

16  Executive Committee and does not articulate the result of the

17  second.  Since does not appear that any discipline occurred as

18  the result of these complaints, the court cannot say that

19  Wander's actions caused plaintiff to lose his ability to contract

20  for two-year privileges with FRHG.  There is also no evidence of

21  discriminatory intent on the part of Wander.  Plaintiff

22  accordingly has failed to make a prima facie case of

23  discrimination against Wander because the evidence does not

24  establish that Wander acted to impede plaintiff's ability to

25  contract with either patients or FRHG.  See Ennix, 556 F. Supp.

26  2d at 1085.

27       5.   FRHG

28       Plaintiff's theory of liability against FRHG for his §

1981 claim is that the doctor defendants were agents of FRHG,
thereby making FRHG vicariously liability for the doctor
defendants' discriminatory actions.  A plaintiff may bring a
cause of action against an employer for violations of § 1981
based on vicarious liability.[4]  <u>Swinton v. Potomac Corp.</u>, 270
F.3d 794, 803 n.3 (9th Cir. 2001).  An employer can be held
vicariously liable for acts of discrimination under § 1981 if the
employee accused of discrimination is a supervisor, "authorized
to hire, fire, discipline or promote, or at least participate in
or recommend such actions . . . ." <u>Miller v. Bank of Am.</u>, 600
F.2d 211, 213 (9th Cir. 1979); <u>see also</u> <u>Swinton</u>, 270 F.3d at 803
(citing <u>Nichols v. Azteca Rest. Enters.</u>, 256 F.3d 864, 875 (9th
Cir. 2001); <u>Ellison v. Brady</u>, 924 F.2d 872, 876 (9th Cir. 1991)).

Plaintiff has provided no evidence that an agency
relationship exists between the doctor defendants and FRHG.  To
the contrary, FRHG has provided a declaration from Chance White,
the Vice President of Quality Management for FRHG, stating that
the medical staff is a separate entity from FRHG and that none of
the doctor defendants are employees of FRHG.  (White Decl. ¶¶
11.)  Without evidence that an employer-employee relationship
existed between FRHG and the doctor defendants, FRHG cannot be
held vicariously liable for the doctor defendants' allegedly

---

[4]   FRHG cites two cases, <u>Meza v. Lee</u>, 669 F. Supp. 325 (D.
Nev. 1987) and <u>Howard v. Topeka-Shawnee County Metropolitan
Planning Commission</u>, 578 F. Supp. 534 (D.C. Kan. 1983) for the
proposition that actions under § 1981 cannot be premised on
vicarious liability.  However, these cases both hold that
municipalities and municipal entities cannot be held vicariously
liable for claims under 42 U.S.C. § 1983.  <u>Meza</u> and <u>Howard</u> are
inapposite because (1) FRHG is not a municipal entity and (2)
plaintiff has not brought a claim under § 1983.  <u>See</u> <u>Collins v.
City of San Diego</u>, 841 F.2d 337, 340 (9th Cir. 1988).

1   discriminatory actions.  <u>See</u> <u>Gen. Bldg. Contractors Ass'n, Inc.</u>

2   <u>v. Pennsylvania</u>, 458 U.S. 375, 396-97 (1982) (holding that § 1981

3   does not impose a nondelegable duty such that an employer can be

4   liable for the discriminatory actions of an independent

5   contractor).  Since plaintiff has not provided any evidence of

6   independent conduct by FRHG and has not provided evidence that

7   the doctor defendants were supervisors under the control of FRHG,

8   the court must grant FRHG's motion for summary judgment as to

9   plaintiff's § 1981 claim.

10      B.   <u>Section 1985 Claim</u>

11          Plaintiff's second cause of action alleges that

12   defendants entered a conspiracy to violate his constitutional

13   rights in violation of 42 U.S.C. § 1985(3).  To successfully

14   bring a cause of action under § 1985(3), a plaintiff must prove

15   three elements: "(1) the existence of a conspiracy to deprive the

16   plaintiff of equal protection of the laws; (2) an act in

17   furtherance of the conspiracy and (3) a resulting injury."

18   <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1141 (9th Cir. 2000);

19   <u>see also</u> <u>Sever v. Alaska Pulp Corp.</u>, 978 F.2d 1529, 1536 (9th

20   Cir. 1992) (quoting <u>United Bhd. of Carpenters & Joiners of Am. v.</u>

21   <u>Scott</u>, 463 U.S. 825, 828-29 (1983)).  Furthermore, the plaintiff

22   must identify the deprivation of a legally protected right

23   motivated by "some racial, or perhaps otherwise class-based,

24   invidiously discriminatory animus behind the conspirators'

25   action."  <u>Griffith v. Breckenridge</u>, 403 U.S. 88, 102 (1971);

26   <u>Sever</u>, 978 F.2d at 1536.

27          1.   <u>The Doctor Defendants</u>

28          To prove the existence of a conspiracy, "an agreement

22

1  or 'meeting of the minds' . . . must be shown." <u>Fonda v. Gray</u>,

2  707 F.2d 435, 438 (9th Cir. 1983).  A meeting of the minds "'can

3  be inferred from conduct and need not be proven by evidence of an

4  express agreement.'" <u>Scott v. Ross</u>, 140 F.3d 1275, 1284 (9th

5  Cir. 1998) (quoting <u>Ward v. EEOC</u>, 719 F.2d 311, 314 (9th Cir.

6  1983).  "A claim of conspiracy, being dependent on questions of

7  intent, may not always be amenable to disposition on summary

8  judgment." <u>Fonda</u>, 707 F.2d at 438.

9        Plaintiff has provided sufficient evidence such that a

10  jury might find that a conspiracy to discriminate against

11  plaintiff existed among Marks, Wy, and Kumar.  Plaintiff

12  submitted evidence that Marks, Wy, and Kumar subjected him to

13  heightened levels of scrutiny and review.  Dr. Richard Brouette,

14  a doctor with FRHG privileges, testified in his deposition that

15  the peer review process has been used for improper political

16  purposes in the past.  (Am. Nguyen Decl. Ex. W ("Brouette Depo.")

17  at 40:6-25, 48:19-24.)  Plaintiff also filed declarations from

18  multiple women stating that Kumar and Wy attempted to prevent

19  plaintiff from being assigned as their child's physician in

20  contravention of hospital policy despite the women's requests to

21  the contrary.  (<u>See</u> <u>id.</u> Exs. AA, CC-DD, FF.)

22        Plaintiff also submits evidence that Kumar allegedly

23  told plaintiff that he "cannot fight <u>us</u>, <u>we</u> will ruin your

24  reputation behind your back, even people who don't know you will

25  hate you" and that "every once and a while <u>we</u> will poke you with

26  a stick to teach you who is in charge around here." (Am. Ndulue

27  Decl. ¶¶ 15-16 (emphasis added).)  These statements imply that a

28  group of individuals were acting to harass plaintiff.  Kumar's

1  statements, along with the similarities between Marks, Wy, and

2  Kumar's actions, taken in a light most favorable to plaintiff,

3  could allow a jury to find that a conspiracy existed to

4  discriminate against plaintiff and that Marks, Wy, and Kumar

5  acted in furtherance of this conspiracy.  See Scott, 140 F.3d at

6  1284; Fonda, 707 F.2d at 438.  Finally, the court has already

7  indicated that sufficient evidence exists to present a triable

8  issue of fact as to whether Marks, Wy, and Kumar discriminated

9  against plaintiff because of racial animus, thereby bringing the

10 conspiracy within the ambit of § 1985(3).

11         However, plaintiff has not presented sufficient

12 evidence to allow a finding that Lins, Wander, or Raman were

13 members of such a conspiracy against him.  Plaintiff has

14 presented no evidence that Lins, Wander, or Raman actively

15 participated in or assisted the actions of Marks, Wy, or Kumar.

16 There is also not the same high degree of similarity between the

17 actions taken by Lins, Wander, and Raman and those taken by the

18 other doctor defendants such that a reasonable jury could infer

19 that Lins, Wander, or Raman acted as part of the alleged

20 conspiracy.  Specifically, plaintiff has not presented evidence

21 that Lins, Wander, or Raman subjected him to abnormally high

22 levels of peer review or diverted patients from him in

23 contravention of hospital policy.  As previously noted, plaintiff

24 has not also provided evidence that Raman, Lins, or Wander

25 deprived plaintiff of a legally protected right or were motived

26 by racial animus.  Since plaintiff has not presented evidence

27 evincing Lins, Wander, or Raman's participation in a common

28 scheme against plaintiff motivated by racial animus, the court

24

1 accordingly must grant their motions for summary judgment on

2 plaintiff's § 1985(3) claim.  See Ward, 719 F.2d at 314 (holding

3 a defendant was entitled to summary judgment where plaintiff

4 failed "to point to any facts probative of a conspiracy"); see

5 also Griffith, 403 U.S. at 102; Sever, 978 F.2d at 1536.

6        2.   FRHG

7        While plaintiff has alleged a § 1985(3) claim against

8 Marks, Wy, and Kumar, he has failed to allege any actions by FRHG

9 that support its involvement in the alleged conspiracy or any

10 acts it took to further this conspiracy.  Plaintiff argues that

11 FRHG facilitated the doctor defendants' conspiracy by allowing

12 them to use peer review as a tool against him.  However,

13 plaintiff has supplied no evidence to indicate that FRHG had

14 oversight over the peer review process, or was even aware that

15 the defendant doctors were acting improperly.  There is no

16 evidence to indicate that there was a "meeting of the minds"

17 between FRHG and the defendant doctors.  Although FRHG could be

18 vicariously liable for Marks, Wy, and Kumar's actions if the

19 doctor defendants were its employees, as previously noted,

20 plaintiff has not proffered evidence that the doctor defendants

21 were agents of FRHG.  See Scott, 140 F.3d at 1284.  Accordingly,

22 the court must grant FRHG's motion for summary judgment on

23 plaintiff's § 1985(3) conspiracy claim.  See Mustafa, 157 F.3d at

24 1181.

25   C.   State Law Claims

26        Plaintiff's Complaint also pleads claims for

27 interference with prospective business and economic

28 relationships, intentional infliction of emotional distress,

25

negligent infliction of emotional distress, and violation of California's Unfair Competition Law.  Plaintiff's Opposition states that plaintiff "would like to proceed only on [his] First and Second Cause [sic] of Action for racial discrimination." (Opp'n (Docket No. 191) at 10 n.1.)  Since plaintiff does not oppose summary judgment on these claims, the court will accordingly grant defendants' motions for summary judgment on plaintiff's third through sixth causes of action.

IT IS THEREFORE ORDERED that Marks, Wy, and Kumar's motions for summary judgment be, and the same hereby are, GRANTED as to plaintiff's claims for interference with prospective business and economic relationships, intentional infliction of emotional distress, negligent infliction of emotional distress, and violation of California's Unfair Competition Law and DENIED in all other respects.

IT IS FURTHER ORDERED that FRHG, Raman, Lins, and Wander's motions for summary judgment be, and the same hereby are, GRANTED.

DATED:  June 24, 2010

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

26